**Vivian Anderson SMITH, Plaintiff,**

v.

**MONTGOMERY COUNTY, MARYLAND, et al., Defendants.**

Civ. A. No. J–82–1323.

United States District Court, D. Maryland.

Sept. 13, 1982.

Clausen Ely, Jr., Donna M. Murasky, Ellen J. Flannery, Covington & Burling, Washington, D.C., Robert H. Symonds, Lanham, Md., for plaintiff; Arthur B. Spitzer, Elizabeth Symonds, American Civil Liberties Union Fund of the Nat. Capital Area, Washington, D.C., Edward L. Genn, Rockville, Md., of counsel.

Robert G. Tobin, Jr. Deputy County Atty., Suzanne Levin, Carole A. Jeffries, Jennifer Evans, Asst. County Attys., Rockville, Md., for defendants.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

Vivian Anderson Smith brought this action against Montgomery County and several individual defendants,[1] on behalf of herself and similarly situated persons, seeking declaratory and injunctive relief and damages. She challenges the practice of performing nonprivate, visual strip searches on persons detained temporarily[2] at the Montgomery County Detention Center, absent probable cause to believe these detainees possess weapons or contraband. She does not challenge the county's right to perform a less intrusive search of all persons detained at the center, nor does she challenge its right to perform a visual strip search when there is probable cause to believe a temporary detainee has concealed a weapon or contraband on his or her person. She does, however, seek to have even visual strip searches based on probable cause performed in private.

Plaintiff moved for a preliminary injunction, asking that temporary detainees not be subjected to visual strip search except upon probable cause and that such searches be conducted in private. Memoranda, affidavits, and a stipulation of facts were filed, and testimony was taken and oral argument was heard on July 13, 1982. Although there is little factual dispute on the issues material to the motion, this opinion constitutes my findings of fact and conclusions of law.

### *The Search of Vivian Anderson Smith*

Vivian Smith was arrested[3] at her home at about 10:00 p. m. on November 12, 1981 for contempt of court, in failing to appear in the Circuit Court for Montgomery County on October 28, 1981 in connection with a child support action originating in Essex County, New Jersey.[4] She was taken to the

---

1. The individual defendants are Paul A. McGuckian, County Attorney; Charles W. Gilchrist, County Executive; Gary R. Blake, Director of the County Department of Correction and Rehabilitation; Bernard D. Crooke, Jr., Chief of Police; and Jane Doe, a guard at the Montgomery County Detention Center. All but Doe are alleged to have some responsibility for promulgating or enforcing the strip search policy that is challenged here. See Stipulation of Facts ¶¶ 3–6.

   References have been made in this opinion to "the County" and the "Montgomery County Detention Center," referring in a general way to the county itself and the individuals responsible in their official capacities for promulgating or enforcing the strip search policy. These references, particularly with respect to the discussion of likelihood of success on the merits, are not intended to be comments on the liability in this action of particular individuals, but only references to the strip search policy itself.

2. "Temporary detainees" includes persons arrested and held overnight or for another short period before appearing before a judicial officer and those waiting to be released while bond is posted, a relative comes, or the like. It does not include all pretrial detainees, for example, those who are unable to make bond and are being held for a matter of weeks or months until trial.

3. Ms. Smith was taken into custody by two officers of the Montgomery County Sheriff's Department on a civil body attachment issued to answer a contempt charge. Affidavit of James A. Young, Sheriff, ¶ 7 and Attachment A–2. She was arrested and booked on a charge of contempt. Affidavit of James A. Young, Sheriff, ¶ 10 and Attachment A–3.

4. She had failed to appear because she believed, correctly as things turned out, that the proceeding had been dismissed in New Jersey.

Rockville District police station, where she was photographed and an arrest report was filed. She was then taken, at about 11:40 p. m., to the Montgomery County Detention Center (MCDC), where she remained overnight. The next day she was transported to the Circuit Court for Montgomery County and, after some delay, appeared before a judge, who dismissed the charge against her.

Upon arrival at the detention center, plaintiff was taken to the women's receiving and discharge area, an open room approximately 15 feet by 20 feet containing a shower, desk and one cell normally used as a holding cell. She was ordered to, and did, remove all her clothing. She then had to move her arms, open her mouth, bend over and squat, while a female correctional officer conducted a visual inspection of her body, including her oral, vaginal and anal cavities. This search took place in the presence of another female detainee, who was in the cell in the room. No weapon or contraband was found. Ms. Smith then showered and was placed in the holding cell with the other female detainee overnight.

### The Detention Center and the Strip Search Policy

All persons[5] held or detained in the MCDC undergo the same preliminary procedures. They are made to remove their clothing, which is checked for weapons and contraband, and their body cavities— mouth, nose, ears, anus, and genital area— are visually inspected. Areas such as the soles of the feet, armpits and hair are also inspected. The guard performing the search does not normally touch the detainee in the inspection.

According to Gary Blake, Montgomery County Director of Correction and Rehabilitation, strip searches are normally performed in private, although the MCDC written policy does not state that they must or should be. If there is insufficient space in other women's areas, a female detainee may be housed in the holding cell in the women's reception area. Screens are available to give some privacy, but Blake conceded that they may not always be used and agreed that it would probably be a good idea to state the privacy requirement in the MCDC written policy.

The strip search is part of initial proceeding of all MCDC detainees, temporary or permanent. All are taken first to a receiving area. In the case of females, this is the receiving room previously described. After processing, newly arrived females who have not yet appeared before a judge are placed in one of three individual cells in the women's wing used for this purpose. Stipulation ¶ 20. After a short period in this area, they are assigned to the dormitory area of the women's wing or to an individual cell. Normally, females are assigned to the dormitory area.

Men proceed first to a receiving area, where new arrivals are processed and searched, then to an intake dormitory area containing 20 beds, where they usually remain for 24 to 72 hours until they are classified for placement in the general population. They are then assigned to a cellblock.

The MCDC houses convicted offenders sentenced to less than 18 months' imprisonment, see Md.Ann.Code art. 27, § 605 (1982), convicted offenders awaiting sentence, pretrial detainees[6] and temporary

---

**5.** The general procedures are the same for males and females. The physical layout of the rooms where they are searched differs.

**6.** The term "pretrial detainees" refers herein to persons who have been arrested, charged and taken before a judicial officer for an initial appearance pursuant to M.D.R. 723 or Md. R. 720(d), but remain in custody because they cannot post bond or otherwise secure release. "Temporary detainees" refers to persons who have been arrested on criminal charges or oth-

erwise detained to appear before a court but have not yet appeared before a judicial officer or are awaiting release shortly.

The County's definition of a "pretrial detainee" as including anyone about whom a judicial determination has been made, i.e., a person arrested on a warrant, has not been used. Counsel for the county stated at oral argument

detainees such as plaintiff.[7] The strip search policy applies to all detainees, regardless of whether there is probable cause to believe they may be concealing weapons or contraband, regardless of where they are housed and regardless of whether they are being held overnight pending a court appearance the next day or for a longer period.

### Legal Discussion

■ Defendants contended at oral argument that plaintiff's claim for injunctive relief is moot. Smith was subjected to the strip search policy once and, except in the unlikely event she might again be a temporary detainee at MCDC, will not be subjected to it again. Her claim for damages has not been mooted, however, and the claim for injunctive relief presents an archetypical situation for application of the "capable of repetition, yet evading review" doctrine. *See, e.g., Bell v. Wolfish,* 441 U.S. 520, 526 n.5, 99 S.Ct. 1861, 1867 n.5, 60 L.Ed.2d 447 (1979). The policy continues to be applied to temporary detainees, however, and it is impossible for the policy to be applied continuously to any individual temporary detainee, who is by definition only in the MCDC for a very short period of time and perhaps only subjected to strip search once. Class relief has been requested, but this Court has not yet had the opportunity to rule on the class certification motion. There is certainly an Article III case or controversy between the class members and the defendants who are continuing to apply the strip search policy.

■ Injunctive relief concerning a general policy is not barred because a class action is not certified. *Evans v. Harnett County Bd. of Education,* 684 F.2d 304, 306 (4th Cir. 1982); *Sandford v. R.L. Coleman Realty Co.,* 573 F.2d 173, 178 (4th Cir. 1978). Pre-

liminary injunctive relief has been granted in sufficiently compelling cases. *Henry v. Greenville Airport Comm'n,* 284 F.2d 631, 633 (4th Cir. 1960) (per curiam); *see Tinetti v. Wittke,* 479 F.Supp. 486, 488 (E.D.Wis. 1979), *aff'd,* 620 F.2d 160 (7th Cir. 1980) (per curiam).

■ The customary standard for deciding whether to issue preliminary injunctive relief is a balancing of hardships test, involving four factors: (1) the likelihood of irreparable harm to plaintiff without the injunction, (2) the likelihood of harm to defendant with the injunction, (3) plaintiff's likelihood of success on the merits and (4) the public interest. *Blackwelder Furniture Co. v. Seilig Mfg. Co.,* 550 F.2d 189 (4th Cir. 1977). The first step in analyzing the factors is to weigh the respective harm to the parties. *Telvest, Inc. v. Bradshaw,* 618 F.2d 1029, 1032–33 (4th Cir. 1980). If the potential harm to plaintiff greatly outweighs the harm to the defendant, plaintiff need not show a likelihood of success on the merits, only a serious question. *Wetzel v. Edwards,* 635 F.2d 283, 287 (4th Cir. 1980); *Telvest,* 618 F.2d at 1032–33. As the harm to the plaintiff, compared with that to defendant decreases, the likelihood of success becomes increasingly important. *Id.* at 1033.

The United States Court of Appeals for the Fourth Circuit has held that a district court "has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." *Henry v. Greenville Airport Comm'n,* 284 F.2d 631, 633 (4th Cir. 1960) (per curiam). Henry was a black civilian employee of the Air Force who was required to sit in a segregated waiting area in the Greenville, South Carolina airport. He

that persons arrested without a warrant are taken before a district court commissioner before they are brought to the MCDC. If so, apparently individuals arrested on a warrant may be held overnight before their initial appearance. The Maryland rules require that persons arrested with or without a warrant be taken before a district court official within 24 hours of arrest. A judicial determination of

probable cause to arrest is not the same as a determination to commit to MCDC.

7. There may be other categories of persons detained in the MCDC from time to time, such as prisoners brought from elsewhere on writs of habeas corpus ad testificandum, but they were not mentioned.

had sued on behalf of himself and similarly situated persons to enjoin the practice. The trial court denied a preliminary injunction on the grounds that plaintiff had failed to show irreparable harm to himself and that the injunction would change the status quo. The Fourth Circuit reversed.

*Henry* is not inconsistent with later Fourth Circuit cases analyzing the standards for granting injunctive relief. *Henry* may simply represent the end of the balance that the Court described in *Telvest,* when it said that as the likelihood of harm to the plaintiff decreases, the likelihood of success becomes increasingly important. Denial of a constitutional right continued, and Henry had demonstrated certainty of success.

■ Although Smith herself will presumably suffer no further harm from the strip search policy, other plaintiffs whom she seeks to represent will be harmed as it continues in the future. Violation of constitutional rights may constitute sufficient irreparable harm to justify preliminary relief. *Cf. Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (loss of First Amendment rights constitutes irreparable harm). Once rights are violated by the strip search, later injunctive relief cannot restore them.

The harm from enjoining the strip search policy differs with respect to the two aspects of the policy challenged, the privacy and the probable cause issues. The defendants have advanced no reasons why performing the searches in private will be harmful; indeed, they claim that is the normal practice. The searches of both males and females are performed in rooms separate from the area where others are held. Only the women's receiving area has a holding cell in which another detainee might sometimes be present, and there are screens available to use if that is the case. Blake testified that the searches are supposed to be private, although he conceded that there may be occasional lapses. No harm of any kind will result if the strip searches are required to be done in private.

The harm relating to the second aspect of the policy challenged requires more discussion. The strip search policy is designed generally to prevent weapons and contraband from entering the MCDC. With respect to a weapon, the purpose is to prevent a detainee from injuring himself, another inmate or a correctional officer and to prevent him from giving a weapon to another inmate who might do the same. Similarly, a purpose of the policy is to prevent a detainee from using contraband or giving it to another to use. The question raised at this point, however, is what harm will occur if the MCDC must change its policy so as to require probable cause for performing strip searches on temporary detainees only. The narrowness of that question must be emphasized. Application of the current policy to those other than temporary detainees is not at issue. In addition, there is no question of not searching temporary detainees at all, nor are strip searches of temporary detainees precluded in all cases. The issue is simply what harm is caused at the present time if MCDC is required to adopt other means of searching temporary detainees in the first instance,[8] conducting a strip search only if there is probable cause[9] to

8. It should perhaps be noted that a person remains a "temporary detainee" for only a short period of time. Some such persons may appear before a judicial officer and be released, others may be committed to the MCDC. The latter persons then fall into the category of "pretrial detainees," and no question is raised about searching them after they have been committed to the MCDC.

9. Defendants correctly point out that the general test for searches of pretrial detainees is reasonableness under the circumstances. The point of "probable cause" requirement for searches of temporary detainees is that if other considerations such as contact with the general inmate population are found to be absent or minimal, the highly intrusive nature of the strip search can only be justified in terms of prison security when applied to a temporary detainee if there is some cause or reason to believe that a particular person has concealed a weapon or contraband on his or her person.

Because there are various legal meanings of the term "probable cause," it should be noted that the appropriate standard is probably that of searches incident to arrest. *See Tinetti,* 479 F.Supp. at 490. Factors include the kind of

believe that a temporary detainee has concealed a weapon or contraband on his person.

The county has pointed to the relative ineffectiveness of other search methods, compared with the present procedure, the difficulty of application of an individualized standard of probable cause, and the fact that all temporary detainees have contact with the institution's "general population." [10] Little evidence was presented on how effective other methods of search, including a search of clothing, a patdown search, and use of metal detectors, may be, as compared with the present policy. It may perhaps be conceded that these methods would not reveal small non-metal items concealed on the person, for example, in body cavities. How often such items have been found in these locations, particularly on temporary detainees, was not indicated. Blake testified in general terms that quite a few prohibited items have been found, but he conceded that a thorough patdown search would probably have found most of the items. The visual strip search was justified as a faster, surer method of search.

Although Blake testified that new detainees were placed in the general population, it was stipulated that new female detainees who have not yet appeared before a judicial officer are, as a matter of general practice, held in one of three cells in the women's wing designated for that purpose. As plaintiff's case illustrates, apparently they may also be kept in the holding cell in the reception room. Each cell is a separate, enclosed unit. The cells in the women's cellblock area, including the three normally used for new arrivals who have not appeared before a judicial officer, are customarily locked only from 11:00 p. m. to 6:00 a. m., so that detainees and inmates have access to each other and a cellblock day area at other times. A temporary detainee in one of the three "intake" cells does have access to other temporary detainees and possibly to some non-temporary inmates, if the present practice of leaving the cells open during the daytime continues.

Newly arrived males, including temporary detainees, are placed in a dormitory intake section of the men's area of the center. Even inmates serving short sentences are apparently kept there for a short period of time until they are classified for placement. A male temporary detainee thus has access to all detainees in the dormitory area. The men's intake area has a 20-bed capacity, although it was not developed at the hearing how many men are normally in the area at any particular time.

It must be noted, in considering the issue of access to the general population, that the detainees who are serving short sentences and the detainees who have appeared before a judicial officer and are unable to secure pretrial release may be strip-searched themselves, so that the danger inherent in the comingling of the temporary detainees with them is that a temporary detainee may be able to smuggle in an item that has eluded search methods less stringent than a visual strip search, either to use on a person in the general population or to give to one. The facts presented as to the present intake system indicate that even this limited danger could be eliminated by segregating temporary detainees from others.

To sum up the balancing of the hardships, the harm to plaintiff and future members of the class she seeks to represent is, although intangible, irreparable. The harm is the embarrassment and indignity suffered by one subjected unnecessarily to a rather offensive procedure; it cannot be measured in economic terms. In reaching this conclusion, I do bear in mind that plaintiff's case represents an extreme, in that she was taken into custody initially, and consequently subjected to the strip search, on a civil body attachment, not an arrest warrant on criminal charges. Most others temporarily detained at the MCDC are presumably taken into custody, with or without a warrant, on criminal charges, the

---

offense charged, the nature of the offender and possibly the circumstances of arrest.

**10.** This term refers herein to all detainees or inmates except temporary detainees.

nature of which may vary widely. The harm to defendants occasioned by the narrow relief requested is slight. I do not discount the important interests of MCDC in protecting the safety of its employees and inmates and keeping contraband out of the center. As previously noted, however, the issue here is only what harm will be caused if MCDC is required to change its search policy with regard to temporary detainees. The chief harm adduced is that performing another kind of search may take slightly longer and that some discretion will have to be used to determine whether a strip search is justified in particular cases. No new physical facilities would be required, and the present intake system could be adapted fairly readily, if necessary, to segregate temporary detainees from others. The balance of hardships does not weigh heavily in favor of defendants.

Likelihood of success is a very important factor in this case. The United States Court of Appeals for the Fourth Circuit held in *Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), —— U.S. ——, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), that a very similar across-the-board strip search policy of the Arlington County, Virginia Detention Center was unconstitutional under the *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), test of reasonableness under the circumstances. 660 F.2d at 1013. The search of plaintiff Logan, when balanced against the invasion of her rights involved, did not have such a discernible relationship to security needs at the detention center that it could reasonably be thought to be justified.[11] *Id.* The Court continued:

> At no time would Logan or similar detainees be intermingled with the general jail population; her offense, though not a minor traffic offense, was. nevertheless one not commonly associated by its very nature with the possession of weapons or contraband; there was no cause in her specific case to believe that she might possess either; and when strip-searched, she had been at the Detention Center for one and one-half hours without even a pat-down search. An indiscriminate strip search policy routinely applied to detainees such as Logan along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations.

*Id.* (citing *Tinetti v. Wittke,* 479 F.Supp. 486, 490–91 (E.D.Wis.1979)). This passage has been quoted in its entirety because it supplies the basis of some of the county's arguments.

*Logan,* for all the defendants' efforts to distinguish it, is controlling. The strip search in *Logan* was an indiscriminate one, performed on all detainees upon arrival at the county detention center. *Id.; see* 500 F.Supp. 502, 506 (E.D.Va.1980). Ms. Logan had appeared before a magistrate who released her on her own recognizance but also committed her to the custody of the sheriff for four hours or until someone came to pick her up. Whatever her technical status, she was treated as a pretrial detainee in the detention center by the sheriff and by the trial and appellate courts. Although the *Logan* opinions refer to commitment to the custody of the sheriff and to his strip search policy, 660 F.2d at 1013, 500 F.Supp. at 506, it is apparent, upon close reading, that the search was performed at a county center, which was apparently run by, or came under the jurisdiction of, the sheriff's department. Logan was arrested for driving while intoxicated, but the Fourth Circuit's analysis was not based on the nature of the offense, except that it was not one by its very nature commonly associated with weapons or contraband. *But cf. Tinetti v. Wittke,* 479 F.Supp. 486, 490–91 (E.D.Wis. 1979), *aff'd,* 620 F.2d 160 (7th Cir. 1980) (per curiam) (case restricted to non-misdemeanor traffic offenses, pretrial detainees charged with criminal offenses distinguished).

Defendants' heavy reliance on the intermingling of its temporary detainees with

---

11. In reaching this conclusion, the Court disposed of the sheriff's good faith defense, as well as the issue of constitutionality. *See id.* at 1012 n. 6.

the general population is misplaced on legal and factual grounds. That was only one of several factors mentioned by the Court of Appeals in *Logan,* 660 F.2d at 1013, and the combination of the factors led it to conclude not only that the indiscriminate strip search policy was unconstitutional, but also that it could not reasonably even have been thought to be justified. Moreover, as discussed above, the intermingling of temporary detainees with the "general population" at MCDC is limited, and even the limited extent could be avoided.

The likelihood of success on the merits in this case is high. With respect to conducting a strip search in private, even if all defendants' arguments were accepted, there is no reason why the initial search of incoming detainees cannot be done in private. The county conceded as much. The likelihood of success on the probable cause aspect of the merits is also high. Although the factual presentation at the preliminary injunction hearing was brief, the key factual issues—the policy as now applied, the present receiving procedures, and the physical setting of the men's and women's receiving and intake areas—do not seem likely to change. For the reasons previously elaborated, this Court finds that *Logan* is controlling on the merits.

The final factor to be considered in connection with the preliminary injunctive relief is the public interest. There is some interest of the public in Montgomery County in security at MCDC, but even that narrow interest is not disserved by the limited relief sought here. Montgomery County residents and others who may be temporarily detained have at least as much interest, in this narrow sense, in not being subjected unnecessarily to humiliating, degrading strip searches. The public with whose interest this Court must be concerned is not either of these narrowly defined "publics," but a broader, more general one. To the extent that the public interest is a factor, it weighs in favor of restricting searches of temporary detainees to the extent necessary to protect penal security.

This Court is mindful that preliminary injunctive relief that changes, rather than simply maintains, the status quo is to be afforded sparingly. *E.g., Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir. 1980). However, for all the reasons previously discussed, this case is one that merits such relief. Plaintiff's motion for preliminary injunction is granted. Defendants will be enjoined from permitting, promulgating a policy permitting, or enforcing a policy permitting the visual strip search of a temporary detainee, as that term has been defined herein, except upon probable cause to believe such detainee has weapons or contraband concealed on his or her person and from permitting, promulgating a policy permitting or enforcing a policy permitting the conducting of such searches other than in private. Nothing in this opinion is to be construed as preventing the MCDC from performing other kinds of searches of temporary detainees or from performing a visual strip search of a temporary detainee when probable cause, as that term is defined in the search context, exists to believe that a temporary detainee may have weapons or contraband concealed on his or her person.