Jeff FORD, A Minor Child, By His Next Friend, Vickie FORD; Sean Jordan, A Minor Child, By His Next Friend, Cheryl Jordan; Mario Sanders, A Minor Child, By His Next Friend, Jerome Sanders; and Michael Shelby, Jr., A Minor Child, By His Next Friend, Michael Shelby, Sr., Plaintiffs,

v.

Owen SULLY, individually and in his official capacity as Sheriff of Wyandotte County, Kansas, and his agents, subordinates and employees, and The Board of County Commissioners of the County of Wyandotte, Joe Dick, Verdis Robinson, and Kay Nies, individually and in their official capacity as Board of County Commissioners of the County of Wyandotte, and John Doe, Defendants.

Civ. A. No. 90–2359–0.

United States District Court,
D. Kansas.

Aug. 15, 1991.

**1458**

William D. Peters, Jr., Kansas City, Kan., Thomas D. Munro, Kansas City, Mo., for plaintiffs.

Terri L. Bezek, James R. Gohen, Deryl· W. Wynn, McAnany, Van Cleave & Phillips, P.A., Kansas City, Kan., Carl A. Gallagher, Atty. General's Office, Kansas Judicial Center, Topeka, Kan., for defendants.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on defendants' motion to dismiss. Wyandotte County Sheriff Owen L. Sully (hereinafter "Sully") and the Board of Wyandotte County Commissioners (hereinafter "board") argue that the claims asserted by plaintiffs Jeff Ford (hereinafter "Ford"), Sean Jordan (hereinafter "Jordan"), Mario Sanders (hereinafter "Sanders") and Michael Shelby, Jr. (hereinafter "Shelby") are barred by the doctrine of res judicata. The defendant board and Sully also assert that plaintiffs are collaterally estopped from litigating their claims. In addition, defendants contend that plaintiffs lack standing to pursue claims for declaratory and injunctive relief. For the reasons stated below, the court will deny defendants' motion.

## I. STATEMENT OF FACTS

Ford, Jordan, Sanders, and Shelby are juveniles who have been detained pending trial, or have been adjudicated as juvenile offenders and are awaiting commitment to a state youth facility. They were confined to the old Wyandotte County jail pursuant to standing orders of the Wyandotte County District Court. Plaintiffs allege that defendants have operated the county jail and county juvenile detention center in such a manner as to violate their First, Fourth, Eighth, and Fourteenth Amendment rights. The juvenile detainees further claim that violations of their constitutional rights have resulted in a substantial breakdown in the provision of basic services and humane treatment to juveniles in the county's custody.[1]

Sheriff Sully and the defendant board contend that plaintiffs are precluded under the doctrines of standing, collateral estoppel, mootness and res judicata from litigating their claims. Defendants argue that plaintiff's complaint is merely a "carbon copy" of grievances asserted by inmates at the county jail in February of 1985. In that case, *Woodson v. Quinn*, No. 85–3049, "adult citizens" alleged that they were subjected to illegal and unconstitutional conditions at the county jail. The *Woodson* court found that the jail was "an outdated facility that lacks the capacity to serve the needs of a county confinement center."

---

1. Plaintiffs' amended complaints allege not only constitutional violations regarding physical deficiencies of the jail itself, but also a failure on the part of the defendant board and Sheriff Sully to provide the most basic services, including reasonable medical and mental health care, appropriate food, sufficient personal hygiene materials, adequate supervision and grievance procedures, educational programs, and recreational activities.

The parties in *Woodson* consented to the entry of a judgment and decree which outlined affirmative steps for defendants to take in order to address allegations asserted by the adult inmates. The decree included plans and specifications for the construction of a new detention facility.[2] Defendants in *Woodson* were required to file quarterly reports with the court which describe operation of the new jail facility. In several of the quarterly reports, the defendant board and sheriff stated:

> [T]he juvenile detention facility is not included in [the *Woodson*] lawsuit and therefore not under the Court's present jurisdiction. Consequently, the operations and procedures policies and the staffing and training plans prepared and implemented by defendants concern only the new Wyandotte County jail and not the juvenile detention facility.

*See, e.g.,* Defendants' Tenth Quarterly Reports at 5 n. 7 and Defendants' Thirteenth Quarterly Report at 5 n. 6 in *Woodson v. Quinn,* No. 85–3049.

The adult population at the Wyandotte County jail was transferred to the new detention complex in March of 1990. Juveniles in custody of the county, however, remained at the old jail.[3] Juvenile detainees were not removed from the jail until October because the state withheld certification and licensure of the new juvenile facility as a result of construction and design deficiencies.[4] On October 9, 1990, juvenile detainees were transferred from the old jail to the detention complex. Plaintiffs Sanders and Ford were among the juvenile detainees moved on October 9, 1990.[5] Orders of release entered by the Wyandotte County District Court indicate that Ford and Sanders have been detained in more than one instance at the new complex.[6] Most recently, Sanders was incarcerated in August of 1991 and Ford was imprisoned during November of 1990.

## II. SUMMARY JUDGMENT STANDARDS

In considering a motion for summary judgment, the court must examine all the evidence in a light most favorable to the nonmoving party. *Barber v. General Elec. Co.,* 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981); *Mahomes–Vinson v. United States,* 751 F.Supp. 913, 916 (D.Kan.1990).[7] A

---

2. While the old jail apparently is not being used by Wyandotte County at this time, Sheriff Sully and County Commission Chairwoman Nies stated in a recent newspaper article that the county is considering whether to renovate and reopen the old jail in order to relieve overcrowding at its new facility. *See* Kansas City Star, Metropolitan Section, July 25, 1991, at 1.

3. Ford was detained in the old county jail for a period commencing on September 8, 1990, and ending on October 9, 1990. Sanders was likewise confined in the "outdated facility" until October 9, 1990. His first day of confinement was August 19, 1990. Jordan was imprisoned from August 27, 1990 to September 4, 1990. Shelby was incarcerated in the old jail from August 27, 1990 to September 26, 1990.

4. The defendant board of county commissioners filed a lawsuit, now pending, against the contractor who designed the new juvenile facility, alleging that there are "various material conditions, fixtures and other appurtenant structures in and to such county correction facility which create material safety and security risks to the general public, county employees and correction facility inmates, and which further materially compromise the ... ability [of the county] to operate such correction facility in an economically efficient manner." *See* Petition filed in *Bd. of County Commrs. of the County of Wyandotte v. Schlup, Becker, Brennen, P.A.,* No. 91C0009 at 6, ¶ 15.

5. Plaintiffs filed their original complaint at 11:10 A.M. on October 9, 1990. Defendants contend that none of the plaintiffs were detained at the old county jail when the complaint was filed. Ford and Sanders state in affidavits, however, that they were not placed in jail cells at the new juvenile annex until 11:30 A.M. that day.

6. The deposition testimony of Jordan reveals that he has been in the county's custody on at least two occasions.

7. Rule 12(b) of the Rules of Civil Procedure was amended in 1946 to permit the treatment of a motion asserting failure to state a claim upon which relief can be granted as a summary judgment motion when "matters outside the pleading are presented to and not excluded by the court." Fed.R.Civ.P. 12(b); *see also Wheeler v. Hurdman,* 825 F.2d 257, 259 (10th Cir.), *cert. denied,* 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987); *M.S. News Co. v. Casado,* 721 F.2d 1281, 1285 n. 3 (10th Cir.1983); 2A J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 12.09[3] (1990). In addition to plaintiffs' original and amended complaints, defendants have appended

moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed.R.Civ.P. 56(c); *Maughan v. S.W. Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985); *see also* 6 J. Moore, *Moore's Federal Practice* ¶ 56.04 (1990) (court is authorized to examine materials outside complaint to determine whether there is genuine issue of material fact to be tried). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record which demonstrate the absence of material fact. *Id.* at 323, 106 S.Ct. at 2552; *Deines v. Vermeer Mfg. Co.*, 752 F.Supp. 989, 993 (D.Kan.1990).

Once the moving party meets these requirements, the burden shifts to the party resisting the motion, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleading." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at

2511; *Tersiner v. Union Pac. R.R. Co.*, 740 F.Supp. 1519, 1522–23 (D.Kan.1990).

## III. DOCTRINE OF STANDING

■ Defendants contend that Ford, Jordan, Sanders, and Shelby do not have standing to assert their claims. The standing doctrine "is designed to determine who may institute the asserted claim for relief." *O'Connor v. City & County of Denver, Colo.*, 894 F.2d 1210, 1214 (10th Cir.1990) (quoting *ACORN v. City of Tulsa, Okla.*, 835 F.2d 735, 738 (10th Cir.1987)).[8] In order to avoid futile proceedings, the court must determine whether the asserted injury was the consequence of defendants' actions and whether prospective judicial relief will remove the harm.[9]

> Standing problems are currently analyzed by the Supreme Court in terms of two inquiries: (a) "whether the [party] alleges that the challenged action has caused him *injury in fact*, economic or otherwise," and (b) "whether the interest sought to be protected by the complainant is *arguably within the zone of interests [sought] to be protected or regulated* by the statute or constitutional guarantee in question."

*Citizens Concerned v. City & County of Denver, Colo.*, 628 F.2d 1289, 1295 (10th Cir.1980) (quoting *Ass'n of Data Processing Serv. Org. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)), *cert. denied*, 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981); *see also* Tribe, *Con-*

---

depositions, documents and affidavits to their motion for dismissal. Plaintiffs have also offered deposition testimony, documents and affidavits. The court will therefore treat defendants' motion to dismiss as a summary judgment motion. In light of the submission of matters outside the pleadings by both parties, we conclude pursuant to Rule 12(b) that the parties have had ample opportunity to present materials made pertinent by treatment of this motion as one for summary judgment.

**8.** The constitutional dimension of standing derives from Article III, which limits the judicial power of federal courts to "cases" and "controversies." *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982).

**9.** The Supreme Court and Tenth Circuit described the prudential aspects of a court's determination of standing:

> The standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.

*Am. Mining Congress v. Thomas*, 772 F.2d 640, 651 (10th Cir.1985) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)), *cert. denied*, 476 U.S. 1158, 106 S.Ct. 2276, 90 L.Ed.2d 718 (1986).

*stitutional Law*, Standing, § 3–17, at 79–80 (1978).

The court has no trouble concluding that plaintiffs have a sufficient stake in this case to obtain judicial resolution of the controversy. We have carefully read the deposition testimony of Ford, Jordan, Sanders and Shelby. All four plaintiffs testified that the conditions of their confinement or the facilities in which they were detained were inadequate in the following particulars: toilets and other fixtures such as sinks and showers were filthy and inoperable; infestation of insects; delayed and deficient medical care; and insufficient supervision. All of the plaintiffs, with the exception of Ford, stated that their cells were unbearably hot. Shelby, Jordan and Ford added that they were deprived of the opportunity to participate in recreational activities and that they were not provided with clean clothing. Every juvenile detainee, except Jordan, testified that the quality or quantity of food furnished by defendants was meager. Three of the plaintiffs also stated that the lighting in their cells was substandard.

More specifically, Jordan testified that defendants would not provide him with clean underwear and other clothing. Jordan added that he saw roaches every day where he slept. Sanders said that his arm "swelled up" from insect bites. Ford claimed that defendants failed to provide timely treatment for broken bones in his left hand. Ford and Sanders allege that they did not receive medical treatment until at least one week after they reported their injuries. Ford also testified that he did not receive "fair" treatment in the county's new detention facility. Further, plaintiffs state that defendants were deliberately indifferent to grievances that they had filed concerning the conditions of their confinement. Plaintiffs' complaints are certainly within the "zone of interests" protected by the First, Fourth, Eighth and Fourteenth Amendments. The court will deny defendants' motion as to the standing doctrine.

## IV. DOCTRINE OF RES JUDICATA

Sully and the defendant board contend that plaintiffs' claims are barred by the doctrine of res judicata. Under res judicata or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980) (citing *Cromwell v. County of Sac, Iowa*, 94 U.S. 351, 352, 24 L.Ed. 195 (1876)); *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Stated differently, " 'a final judgment of the merits bars further claims by parties or their privies based on the same cause of action.' " *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 2209, 60 L.Ed.2d 767 (1979) (quoting *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)); *Wright v. Chandler*, 264 F.2d 249, 253 (10th Cir.1959).

There is no definition of "privity" which can be automatically applied to all cases involving the doctrine of res judicata. *Lowell Staats Mining Co., Inc. v. Philadelphia Elec. Co.*, 878 F.2d 1271, 1275 (10th Cir.1989). Privity requires, at minimum, a substantial identity between the issues in controversy and a showing that the parties in the two actions are really and substantially in interest the same. *Id.; St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1174 (10th Cir. 1979) (citing *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03, 60 S.Ct. 907, 916–17, 84 L.Ed. 1263 (1940) and *Green v. Bogue*, 158 U.S. 478, 503–04, 15 S.Ct. 975, 985, 39 L.Ed. 1061 (1895)). The determination of identity between litigants, for the purpose of establishing privity in connection with the doctrine of res judicata, is a factual question. *Lowell Staats Mining, supra*, 878 F.2d at 1276 (quoting *Astron Indus. Assoc. v. Chrysler Motors Corp.*, 405 F.2d 958, 961 (5th Cir.1968)).

In the court's view, the res judicata doctrine cannot be applied in the case at bar. Ford, Jordan, Sanders, and Shelby certainly were not parties to the *Woodson* Consent Judgment and Decree. The complaint in *Woodson* identifies the plaintiffs

in that case as "adult citizens." The plaintiffs herein are "juveniles being represented by their next friend." In addition, plaintiffs are not privies to the *Woodson* decree. Quarterly reports filed by defendants in *Woodson* clearly establish a lack of "substantial identity" between the issues in this action and the issues in that case. Defendants state in quarterly reports that "the juvenile detention facility is not included in [the *Woodson*] lawsuit." Defendants add in the reports that "the operations and procedures policies and the staffing and training plans prepared and implemented by defendants concern only the new Wyandotte County jail and not the juvenile detention facility." The *Woodson* consent judgment and decree obviously did not include issues raised by juvenile detainees. The issues in that case were limited to the county's plans and policies governing the detention of adults.

Further, the interests of the juvenile plaintiffs are not "really and substantially" the same as those of the *Woodson* plaintiffs.[10] If the interests of juvenile offenders were identical to those of their adult counterparts, there would be no reason to separate the two groups when they are imprisoned.[11] The Kansas legislature, however, has repeatedly proscribed the confinement of juveniles with adults. *See* K.S.A. 19–1919 (juveniles shall be kept in quarters separate from adult criminals); K.S.A.1990 Supp. 38–1692(b)(4) (jail where juveniles are detained must provide for sight and sound separation of juveniles and incarcerated adults); K.S.A. 75–5390a (plan for removal of juvenile offenders from adult jails and adult lockups). Juveniles obviously are not confined with adults because they would be exposed to greater violence.[12]

Deterrence, incapacitation, and just punishment are important considerations in the administration of juvenile justice systems, but the primary goal of any such program is rehabilitation. *See generally* Juvenile Justice and Delinquent Prevention Act, 42 U.S.C. § 5602(b)(2) (policy of Congress is to provide resources for critically needed alternatives to juvenile institutionalization such as delinquency prevention and rehabilitation programs); Kansas Juvenile Offenders Code, K.S.A. 38–1601 (code shall be liberally construed to end that juveniles receive care, custody, guidance, control and discipline as will best serve juvenile's reha-

---

**10.** Juveniles generally receive special treatment from the criminal justice system because of their susceptibility to influence, greater likelihood to act upon impulse, less thought as to consequences of action, and basic lack of maturity and responsibility that is inherent with youth:

> [A]dolescents ... are more vulnerable, more impulsive, and less self-disciplined than adults. Crimes committed by youths may be just as harmful to victims as those committed by older persons, but they deserve less punishment because adolescents may have less capacity to control their conduct and to think in long-range terms than adults.

Twentieth Century Fund Task Force on Sentencing Policy Towards Young Offenders, *Confronting Youth Crime* 7 (1978) (cited with approval in *Eddings v. Oklahoma*, 455 U.S. 104, 115 n. 11, 102 S.Ct. 869, 877 n. 11, 71 L.Ed.2d 1 (1982)). *See also Schall v. Martin*, 467 U.S. 253, 265–66 n. 15, 104 S.Ct. 2403, 2410 n. 15, 81 L.Ed.2d 207 (1984) (society does not hold juveniles to adult standard of responsibility because they are in earlier stages of emotional growth, their intellectual development is incomplete, they have only limited practical experience, and their value systems have not been clearly identified or firmly adopted).

**11.** As plaintiffs point out, "wide differences have been tolerated—indeed insisted upon—between the procedural rights accorded to adults and those of juveniles." *In re Gault*, 387 U.S. 1, 14, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967).

**12.** A recent article in the American Bar Association Journal describes the type of abuse that youth offenders receive when imprisoned with adults and the effect thereof:

> [Y]ouths in adult prisons were five times more likely to be sexually assaulted than in a training school, twice as likely to be beaten by guards, and weapon attacks were fifty percent more common ... Youths' greater exposure to violence in prison may mean that they will become more violent themselves. "The social costs of imprisoning young offenders in adult prisons may be paid in later crime and violence upon their release."

P. Marcotte, *Criminal Kids*, 76 A.B.A.J. 61, 65 (1990) (quoting M. Forst, Ursa Institute Center for Law and Policy (1987)). The plaintiff youths in the instant action surely have a heightened interest in "safe facilities" and "adequate supervision."

bilitation).[13] In order to carry out the goal of rehabilitating juvenile offenders consistent with their constitutional rights, plaintiffs contend that defendants are required to furnish them with "educational programs."[14] The "adult citizens" who filed suit in *Woodson* never asserted a claim for any such programs.[15] The court concludes that Ford, Jordan, Sanders and Shelby were not parties or privies to the *Woodson* consent judgment and decree. Further, we are of the opinion that the claims in the instant action are not based on claims that were or could have been raised in *Woodson.* The court will therefore deny defendants' motion as to the application of res judicata.

## V. DOCTRINE OF COLLATERAL ESTOPPEL

■ Defendants insist that plaintiffs are collaterally estopped from litigating their claims. The doctrine of collateral estoppel, or issue preclusion, is a judge-made rule that prevents relitigation of issues of fact or law "actually and necessarily determined" in a prior lawsuit. *Montana v. United States,* 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–75, 59 L.Ed.2d 210 (1979); *N. Natural Gas Co. v. Grounds,* 931 F.2d 678, 681 (10th Cir.1991); *Searing v. Hayes,* 684 F.2d 694, 696 (10th Cir.1982). Whether the application of collateral estoppel is appropriate necessitates four inquiries: first, whether the party to be estopped was a party to or assumed control of the prior litigation; second, whether the issues presented are in substance the same as those resolved in earlier litigation; third, whether the controlling facts or legal principles have changed significantly since the earlier judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion.

*Montana v. United States, supra,* 440 U.S. at 153–55, 99 S.Ct. at 973–75; *Klein v. Comm'r of Internal Revenue,* 880 F.2d 260, 262–63 (10th Cir.1989).

■ As noted above, plaintiffs in the instant case were not parties to the *Woodson* decree. The complaint in the *Woodson* case was filed by "adult citizens." Plaintiffs herein are juveniles. Further, the juvenile detainees were neither represented by parties to the original lawsuit nor did they assume control of that case. In addition, the legal principles which govern the adjudication and detention of juveniles are significantly different from those applied to the prosecution and incarceration adults. As noted in section III of this memorandum, the emphasis of the juvenile justice system is on rehabilitation. *See Olson v. Maschner,* 10 Kan.App.2d 289, 292, 697 P.2d 893, 895 (1985) (rehabilitation is primary purpose of juvenile offenders code to extent that rehabilitation is consistent with interests and safety of public). When adults are convicted of a crime, however, rehabilitation is not the only concern of the court. Deterrence, incapacitation, and just punishment are equally important considerations. *See* United States Sentencing Commission Guidelines Manual, 1.1 ¶ 2 (1990) (Sentencing Reform Act provided for development of guidelines that further basic purposes of criminal punishment).

More important, the issues presented in this action are not the same as those resolved by the *Woodson* consent judgment and decree. The *Woodson* decree required defendants to submit quarterly reports outlining their progress in achieving mandated goals. Nineteen reports have been filed with the court to date. A cursory review of those reports reveals that defendants' efforts to comply with the decree were

---

**13.** *See also Olson v. Maschner,* 10 Kan.App.2d 289, 292, 697 P.2d 893, 895 (1985) (rehabilitation is primary purpose of juvenile offenders code to extent that rehabilitation is consistent with interests and safety of public).

**14.** The juvenile plaintiffs also insist on the provision of "reading materials" by defendants. Ford testified during his deposition that he wanted to improve his math and reading skills.

**15.** The juvenile detainees in the instant case likewise insist on facilities that are the same or similar to those obtained by adult detainees as a result of the *Woodson* decree. They assert that the facilities in which they are confined are deficient in the following particulars: insufficient heating and cooling; deficient lighting and toilet facilities; and infestation of roaches and other insects.

directed solely at the adult population. Indeed, defendants state as follows in several of the quarterly reports:

> [T]he juvenile detention facility is not included in this lawsuit, and therefore, not under the Court's present jurisdiction. Consequently, the operations and procedures policies and the staffing and training plans prepared and implemented by defendant concern only the new Wyandotte County Jail and not the juvenile detention facility.

See Defendants' Quarterly Reports in *Woodson v. Quinn*, No. 85–3059. The *Woodson* decree also established a jail population control committee. An examination of reports filed by the committee discloses that it was concerned only with issues regarding the population of inmates and detainees who had been certified as adults.

As a result of the *Woodson* decree, policies, procedures and practices governing the rights and privileges of adult inmates were revised.[16] Further, living conditions were improved for the adult population. Ford, Jordan, Sanders, and Shelby now ask this court to address issues concerning their rights, privileges and conditions of confinement as juvenile detainees. Some of plaintiffs' grievances were not raised by the adult inmates.[17] The juvenile detainees assert a number of issues, however, that were previously raised by the *Woodson* plaintiffs because the juvenile detainees contend that they "are subject to unequal treatment in that they are deprived of the same or similar treatment programs and facilities which are provided [to] the adult detainees and adult inmates." In light of the alleged unequal treatment of juveniles, the controlling facts in this case appear to differ significantly from those presented to Judge Saffels in 1987. We are of the opinion that the juvenile detainees did not have an opportunity to raise issues in the *Woodson* case that they now seek to litigate. The court will therefore deny defendants' motion as to the application of collateral estoppel.

## VI. MOOTNESS DOCTRINE

Defendants contend that plaintiffs lack standing to pursue individual declaratory and injunctive relief because their claims are moot.[18] The doctrine of mootness has its constitutional origin in the "case or controversy" limitation of article III, section 2, which ensures that courts exercise their power only in cases where true adversary presentation allows informed judicial decision. *Thournir v. Buchanan*, 710 F.2d 1461, 1462–63 (10th Cir.1983); *Wiley v. Nat'l Collegiate Athletic Ass'n*, 612 F.2d 473, 475 (10th Cir.1979) (en banc), *cert. denied*, 446 U.S. 943, 100 S.Ct. 2168, 64 L.Ed.2d 798 (1980). An actual controversy must be extant at all stages of a case. *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974); *Fed. Deposit Ins. Corp. v. Jennings*, 816 F.2d 1488, 1490 (10th Cir.1987). Federal courts are without authority to decide questions that cannot affect the rights of litigants in the case before them. *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971); *Johansen v. City of Bartlesville, Okla.*, 862 F.2d 1423, 1426 (10th Cir.1988); *Johnson v. Riveland*, 855 F.2d 1477, 1480 (10th Cir. 1988).

The Supreme Court, however, has fashioned an exception to the mootness doctrine

---

**16.** As plaintiff points out, the proposed policy and procedure manual outlined in the First Quarterly Report is directed at the adult inmate population.

**17.** Among the deficiencies alleged by the juvenile detainees in their second amended complaint, the following alleged shortcomings were neither asserted by the *Woodson* plaintiffs nor specifically addressed by the *Woodson* consent judgment and decree: provision of inadequate educational programs to juveniles; unduly burdensome and restrictive communication privileges among juvenile detainees; confinement of juveniles in antiquated facilities which have inadequate heating, cooling, lighting, and toilets; and confinement of juvenile detainees in facilities which are "not certified or approved by the appropriate governmental agencies."

**18.** Defendants also argue that plaintiffs lack standing to pursue class claims. Class relief has been requested, but the court has not yet had the opportunity rule on the class certification motion. Defendants' arguments as to standing to pursue class claims will be addressed when the court rules on plaintiffs' motion for class certification.

when a plaintiff's claim is "capable of repetition, yet evading review," and there is a possibility that the claim "may arise again with respect to that plaintiff." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, —, 110 S.Ct. 1249, 1255, 108 L.Ed.2d 400 (1990); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 1209, 63 L.Ed.2d 479 (1980). In *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Court suggested in dicta that a case brought by pretrial detainees might fit within this exception, writing that it was "most unlikely that any given individual could have his constitutional claim decided ... before he is either released or convicted" and that "the individual could ... suffer repeated deprivations." *Id.* at 110 n. 11, 95 S.Ct. at 861 n. 11. *See also Schall v. Martin*, 467 U.S. 253, 256 n. 3, 104 S.Ct. 2403, 2405 n. 3, 81 L.Ed.2d 207 (1984); *Williams v. Ward*, 845 F.2d 374, 380 n. 6 (2d Cir.1988), *cert. denied*, 488 U.S. 1020, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); *Lucas v. Wasser*, 73 F.R.D. 361, 363 (S.D.N.Y.1976).[19]

When a plaintiff seeking injunctive relief has allegedly been subjected to confinement which is transitory by nature, courts have refused to apply the mootness doctrine where the following conditions exist: (1) subsequent confinement demonstrating "the likelihood that [plaintiff] is vulnerable to future confinement" and (2) "[t]he actual time of confinement is too short to permit judicial review to conclude before discharge." *See, e.g., Tyars v. Finner*, 709 F.2d 1274, 1280 (9th Cir.1983); *Doe v. Gallinot*, 657 F.2d 1017, 1021 n. 6 (9th Cir.

1981); *see also Smith v. Montgomery County, Md.*, 547 F.Supp. 592, 595 (D.Md. 1982) (claim for injunctive relief is "capable of repetition, yet evading review" where "it is impossible for [county detention center] policy to be applied continuously to any individual temporary detainee, who is by definition only in the [detention center] for a very short period of time").

In the present case, there is a definite likelihood that plaintiffs will again be subjected to confinement at either of Wyandotte County's detention facilities.[20] Jordan's deposition testimony indicates that he has been detained by the county on at least two separate occasions. Further, a Wyandotte County District Court order of release reveals that Sanders was confined in the county jail juvenile annex during August of 1991. An order of release in Ford's case indicates he was in the county's custody in November of 1990. Release orders also show that Sanders and Ford were both imprisoned at the annex during November and December of 1989.[21] Given plaintiffs' numerous visits to the county jail and detention center over the course of the past two years, they obviously were not detained for long periods of time. In light of plaintiffs' short-lived status as detainees and the prior and subsequent confinements of plaintiffs Ford, Jordan, and Sanders, the court is convinced that plaintiffs' claims for individual declaratory and injunctive relief are capable of repetition, yet evading review, and there is a possibility that these claims may arise again with respect to plaintiffs.[22] "[I]t is not 'absolutely clear,'

**19.** While the Court in *Gerstein* and *Schall* held only that class claims were not moot, and that the plaintiffs could continue to represent the class on appeal even though the record did not reveal that they were detained at the time of certification, the Court's holdings and reasoning seem to bear directly on the question of individual mootness.

**20.** As noted in footnote no. 2, renovation and reopening of the old county jail is actively under the consideration of defendants.

**21.** The Supreme Court recognized a high rate of recidivism among juveniles in *Schall v. Martin*, 467 U.S. 253, 265, 104 S.Ct. 2403, 2410, 81 L.Ed.2d 207 (1984) and *In re Gault*, 387 U.S. 1,

22, 87 S.Ct. 1428, 1440, 18 L.Ed.2d 527 (1967). In *Gault*, the Court quoted a study on juvenile repeat offenders conducted by the Stanford Research Institute for the President's Commission on Crime. *In re Gault, supra*, 387 U.S. at 22, 87 S.Ct. at 1440. The Commission's report disclosed that over half of the youths referred to juvenile court "had been previously referred at least once." *Id.*

**22.** Sully and the defendant board also appear to assert that plaintiffs' allegations are confined to the physical deficiencies of the old county jail. Since Ford, Jordan, Sanders, and Shelby have been released or transferred to the county's new detention center, defendants contend that plaintiffs' claims are moot. Defendants' argument is

absent [injunctive relief], 'that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Vitek v. Jones*, 445 U.S. 480, 487, 100 S.Ct. 1254, 1260, 63 L.Ed.2d 552 (1980) (quoting *United States v. Phosphate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)). We will therefore deny defendants' motion as to the doctrine of mootness.

IT IS THEREFORE ORDERED that defendants' motion to dismiss (Doc. No. 28) is hereby denied.

without merit. Plaintiffs' claims are not limited to acts allegedly occurring at the old county jail. The juvenile detainees allege in their amended complaints that all tortious, negligent and unlawful acts "occurred at either the Wyandotte County Jail and/or the Wyandotte County Juvenile Detention Center." Further, the alleged unlawful actions are not limited to physical deficiencies. They include operational shortcomings involving the deprivation of rights and privileges. We have no trouble concluding that plaintiffs have presented more than abstract injuries. Ford, Jordan, Sanders, and Shelby have presented issues in a concrete factual setting where self-interested parties are advocating opposing positions.