Janet LEVINSON–ROTH, et al.

v.

John R. PARRIES, et al.

Civ. No. L–91–3668.

United States District Court,
D. Maryland.

Jan. 5, 1995.

---

Jay B. Shuster, of Baltimore, MD, for plaintiffs.

John R. Parries, pro se.

J. Joseph Curran, Atty. Gen., and Steven G. Hildenbrand, Asst. Atty. Gen., for defendants State of Maryland, Kight and Popkin.

Ramona Bell–Pearson, County Atty., and Linda Berk Thall, Asst. County Atty., Montgomery County, MD, for all other defendants.

## MEMORANDUM

LEGG, District Judge.

The Court now considers the motion for summary judgment filed by the State of Maryland, Montgomery County Sheriff Raymond Kight and Deputy Sheriff for Montgomery County Darren Popkin (the "state defendants") and the motion to dismiss, or in the alternative, for summary judgment filed by Devon Brown, Captain Barbara Ward and Corporal Andre Watts (the "county defendants"). For the reasons given below, the Court shall, by separate Order, GRANT IN PART and DENY IN PART both of defendants' motions.

## I. FACTS

Defendants' summary judgment motions do not contest most of the allegations in plaintiff's complaint. Accordingly, the Court shall for the most part assume the truth of the facts in the complaint and draw all inferences in plaintiffs' favor. *Overstreet v. Kentucky Central Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir.1991).

Plaintiff Janet Levinson–Roth divorced John Parries in July 1986. In September 1987, the court awarded custody of the children to Parries and ordered Levinson–Roth to pay child support.

Apparently, a dispute arose between Levinson–Roth and Parries concerning visitation rights. Levinson–Roth alleged that Parries was denying her visitation rights, and she stopped paying child support. In April 1990, the Circuit Court for Montgomery County settled the dispute by ordering Parries to grant Levinson–Roth visitation rights and ordering Levinson–Roth to pay the past due child support. About a week later, the Circuit Court, through Special Master Rita Rosenkrantz, entered a Contempt and Modification Order. Among other things, the Order provided that if Levinson–Roth did not continue to pay her child support, "the Clerk of the Circuit Court, upon written suggestion under oath by [Parries], shall issue a body attachment for [Levinson–Roth]."

On May 3, 1990, Parries took advantage of this provision. He filed an affidavit with the Clerk of the Circuit Court alleging that Levinson–Roth was in arrearage in her child support payments and asked the Circuit Court to issue a Writ for Body Attachment against her pursuant to the Contempt and Modification Order. The Clerk issued the writ on May 4.

On May 8, Deputy Sheriffs Darren Popkin and Brian Roynestad of the Montgomery County Sheriff's Department went to Levinson–Roth's place of employment to execute the body attachment. According to plaintiffs' amended complaint, the deputies "grabbed [Levinson–Roth], threw her against the wall, kicked her legs apart ... and padded [sic] her down" in front of the other employees. (Amended Compl. ¶ 10.) The

deputies then took her to their car where, according to the complaint, they patted her down again. The deputies then took Levinson–Roth to the Sheriff's office where, the complaint alleges, the deputies patted her down a third time.

The Sheriff's Office determined that Levinson–Roth should go to the Seven Locks Detention Center, a part of the Montgomery County Detention Center ("MCDC"). After this determination, the complaint alleges that the deputies patted Levinson–Roth down again and took her to Seven Locks. Upon their arrival at Seven Locks, the deputies patted Levinson–Roth down a fifth time, according to the complaint. Inside Seven Locks, the complaint alleges, the deputies patted her down a sixth and final time.

At Seven Locks, the deputies placed Levinson–Roth in the custody of Corporals Donna Johnson and Timothy Carroll. The officers told Levinson–Roth that institutional rules required her to undress for a strip search, remove her wig and wear a MCDC jumpsuit during her detention. Levinson–Roth objected on the ground that her religious beliefs as "an observant Jew" prevented her from removing her wig or wearing pants. In response to Levinson–Roth's objections, Corporal Johnson contacted Captain Barbara Ward, the officer in charge, who told Levinson–Roth that the institution could not make exceptions to the security requirements.

Subsequently, Captain Ward and Corporal Johnson conducted a strip search of Levinson–Roth. The parties disagree as to whether Levinson–Roth was allowed to wear her undergarments during the search. In her deposition, Levinson–Roth stated that she was wearing neither a bra nor panties at the time of her arrest (Levinson–Roth Depo. at 102) and that Captain Ward and Corporal Johnson told her to remove all of her clothes. (Levinson–Roth Depo. at 167, 184.) Defendants, however, claim that Levinson–Roth wore her undergarments throughout the search. (Ward Depo. at 40.) For the purposes of the instant motions, the Court ac-

cepts plaintiffs' version of the facts. *Overstreet,* 950 F.2d at 937.

In any event, the officers commenced the search. Levinson–Roth removed her wig and the rest of her clothes. The officers provided her a towel with which to cover her head, (Ward Depo. at 16), and Captain Ward apparently conducted the search. (Ward Depo. at 30.) The officers visually inspected her and touched her lightly during the course of the search. (Levinson–Roth Depo. at 186.) Neither party disputes that only Ward and Johnson were present during the search, that no male officers were present and that no other officers could view the search area.

After the search, the officers took her picture. For the picture, they required her to remove the towel they had given her from her head, to obtain an accurate likeness of her. (Ward Depo. at 16.) She replaced the towel immediately after the officers took the picture. (*Id.*)

Plaintiffs allege that, after the search, the officers took Levinson–Roth to the shower. Again, Levinson–Roth objected that she could not wear the jump suit because of her religion. In response, the complaint states, one of the officers told her to "wear pant [sic] or go naked." (*See also* Levinson–Roth Depo. at 172.) According to the complaint, Levinson–Roth remained in the shower for two hours, where she suffered chest pains, dizziness and nausea. After the shower, Levinson–Roth was dressed in the MCDC jump suit, including the pants. The detention center released her shortly afterward when a friend posted her bond.

Shortly thereafter, the Circuit Court held a hearing on the Writ of Body Attachment and Levinson–Roth's alleged delinquency on her child support payments. An examination of the court records revealed that, contrary to Parries's affidavit, Levinson–Roth was not delinquent on her child support payments at the time Parries requested the writ of body attachment.

Levinson–Roth and her husband Jacob Roth, filed suit under 42 U.S.C. § 1983 against Parries, Special Master Rosenkrantz,[1] Montgomery County Sheriff Ray-

---

1. Plaintiffs have settled their case against Special Master Rosenkrantz out of court. Under the

mond Kight, Deputy Sheriffs Roynestad, Deputy Sheriff Popkin, Calvin Lightfoot (director of the MCDC at the time Levinson–Roth was arrested), Captain Ward, Corporal Johnson, Corporal Watts, Corporal Carroll,[2] the Montgomery County Government and the State of Maryland. Devon Brown, the present director of the MCDC, became a defendant when he took over the position from Lightfoot.[3] Lightfoot remains a defendant in his personal capacity. (Pl.Resp. to Def.Mot. for Summary Judgment ¶ 1.)

Plaintiffs' complaint alleges that defendants, under color of law, deprived her of her constitutional rights. As a result, plaintiffs allege, Levinson–Roth suffered elevated blood pressure, anxiety and depression, for which she took tranquilizer pills and underwent psychotherapy. According to the complaint, she remained under the care of an outpatient mental health facility from May 22, 1990 to February 8, 1991, and she could not return to work until February 11, 1991. Plaintiffs seek $50,000 in compensatory and punitive damages, $100,000 for loss of consortium, and declaratory and injunctive relief.

## II. DISCUSSION

### A. The State Defendants' Motion for Summary Judgment

#### 1. The State Defendants' Arguments

The State of Maryland, with Montgomery County Sheriff Raymond Kight and Deputy Sheriff Popkin, filed one of the motions presently under consideration. The motion argues that (1) the Eleventh Amendment bars plaintiffs' claims against the State of Maryland and its officers; (2) none of the state defendants may be held liable because none qualifies as a "person" within the meaning of § 1983; (3) the State of Maryland bears no responsibility for the actions of the Montgomery County Sheriff's Office or the Seven

Locks Detention Center; (4) the complaint fails to state a basis for supervisory liability as to the State of Maryland and Sheriff Kight; (5) the complaint fails to state a constitutional claim against the state defendants in either their official or personal capacities; and (6) no genuine issue of material fact exists. In their reply to plaintiffs' response to the summary judgment motion, defendants also argue that the case is moot, because Levinson–Roth is no longer in custody.

In their response to the state's summary judgment motion, plaintiffs concede two of the state defendants arguments. Plaintiffs first concede, as they must, that they cannot recover monetary damages against the State of Maryland or its officers in their official capacity in federal court. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Plaintiffs also concede that they cannot hold the state defendants responsible for the alleged constitutional violations that occurred at the Seven Locks Detention Center because Seven Locks is a county rather than a state institution. *See* Md.Ann.Code Art. 41, § 4–102(a) (1993).

According to plaintiffs' response, plaintiffs seek to hold Deputy Sheriff Popkin personally liable for the alleged § 1983 violations. Plaintiffs also seek declaratory and injunctive relief against all of the state defendants, alleging that Deputy Popkin carried out the alleged conduct pursuant to official state policy. Finally, plaintiffs seek to hold Sheriff Kight liable for the actions of his deputies under the doctrine of respondeat superior.

■ The Court may grant the defendants' summary judgment motion if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*,

---

settlement, Master Rosenkrantz has ordered that no further writs of body attachment will issue at Parries's suggestion.

**2.** On November 9, 1993, the Court approved plaintiffs' withdrawal of their claims against Corporal Carroll, Corporal Johnson and Deputy Roynestad.

**3.** Pursuant to Federal Rule of Civil Procedure 25(d)(1), Calvin Lightfoot passed the liability in this action to his successor in office, Devon Brown. Lightfoot remains a defendant in his personal capacity, however. (Pl.Resp. to Def. Mot. for Summary Judgment ¶ 1.) Accordingly, the Court shall instruct the Clerk of the Court to add Devon Brown in his official capacity as a defendant.

477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court views the facts, and all reasonable inferences to be drawn from them, in the light most favorable to plaintiff. *Overstreet,* 950 F.2d at 737; *Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir. 1987).

With these principles in mind, the Court shall address the substantive issues this case presents.

### 2. *Standing*

Although the parties have not addressed the issue, the Court must first address the issue of whether Article III of the Constitution allows plaintiffs to seek injunctive relief in this court. *Juidice v. Vail,* 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977) (citing *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)); *North Carolina v. Rice,* 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam). Without standing, this Court lacks jurisdiction to grant the requested relief.

■ "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The case-or-controversy requirement includes the doctrine of standing, *Lujan v. Defenders of Wildlife,* 504 U.S. 555, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992), which requires a plaintiff seeking relief in federal court to "allege[ ] personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen,* 468 U.S. at 751, 104 S.Ct. at 3324. The injury must be "distinct and palpable, and not abstract or conjectural or hypothetical." *Id.* at 751, 104 S.Ct. at 3324 (internal quotation marks and citations omitted). For purposes of a summary judgment motion, the plaintiff bears the burden of proving the existing of standing by affidavit or other evidence. *Defenders of Wildlife,* 504 U.S. at ——–——, 112 S.Ct. at 2136–37.

■ In *Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court discussed the doctrine of standing in relation to a § 1983 claim. There, the Los Angeles Police Department subjected plaintiff Lyons to a chokehold while Lyons was stopped for a routine traffic violation. Lyons alleged that the chokehold caused him lasting physical harm and violated his constitutional rights. Accordingly, Lyons sued the Los Angeles Police Department under 42 U.S.C. § 1983, seeking among other things an injunction against the police department prohibiting the department from subjecting him to chokeholds in the future.

The Supreme Court held that Lyons had not made out an actual case or controversy necessary for standing to assert a claim for injunctive relief. To satisfy the standing requirements of Article III, the Court held, Lyons not only would have had to allege that he would have another encounter with the police, but would have had to make "the incredible assertion either (1) that *all* police officers ... *always* choke any citizen with whom they happen to have an encounter ... or (2) that the City ordered or authorized police officers to act in such manner." *Id.* at 105–06, 103 S.Ct. at 1667 (emphases in original). Even if Lyons had alleged that the City authorized the police to use chokeholds in an allegedly illegal manner, the Court said, he would have had to indicate "why [he] might be realistically threatened by police officers who acted within the strictures of the City's policy." *Id.* at 106, 103 S.Ct. at 1667. In short, Lyons would have had to "demonstrate that he, himself, [would] not only again be stopped by the police but [would] also be choked without any provocation or legal excuse." *Id.* at 107 n. 7, 103 S.Ct. at 1668 n. 7.

That the Los Angeles Police Department had previously choked Lyons, the Court held, "[did] nothing to establish a real and immediate threat" that the police would choke him again. *Id.* at 106, 103 S.Ct. at 1667. Rather, the Court held that Lyons's assertion that he faced the danger of being subjected to another chokehold constituted "no more than conjecture." *Id.* at 108, 103 S.Ct. at 1668. The Supreme Court therefore held that Lyons lacked standing to obtain injunctive relief.

In deciding *Lyons,* the Supreme Court relied heavily on *O'Shea v. Littleton, supra.* In *O'Shea,* a class of plaintiffs brought suit,

claiming that they had been subjected to discriminatory enforcement of criminal laws. As in *Lyons,* the Court held that the plaintiffs lacked standing. Although past wrongs could show whether there existed a "real and immediate threat of repeated injury," the Court held, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea,* 414 U.S. at 495–96, 94 S.Ct. at 676. The Court held that "attempting to anticipate whether and when [the plaintiffs] will be charged with crime and will be made to appear before [the defendants]" would take the Court "into the area of speculation and conjecture" rather than the real and immediate danger Article III requires. *Id.* at 497, 94 S.Ct. at 676.

As in *Lyons* and *O'Shea,* plaintiffs here can demonstrate no "real and immediate" threat that the defendants will repeat the alleged constitutional violations. To the contrary, the settlement agreement between plaintiffs and Special Master Rosenkrantz negates the possibility that Parries will again be able to have Levinson–Roth arrested by virtue of his word alone. In comparison, neither Lyons or the plaintiffs in *O'Shea* had the benefit of protection from future official action. Levinson–Roth therefore faces negligible danger of again being wrongly arrested for failure to pay child support. The remoteness of this danger deprives plaintiffs of the "real and immediate threat" necessary to support standing for injunctive relief against the state defendants.

Similarly, plaintiffs lack standing to obtain declaratory relief. The Declaratory Judgment Act allows declaratory relief only in cases in which an "actual controversy" exists. 28 U.S.C. § 2201. The requirement of an "actual controversy" means that, "for adjudication of constitutional issues, concrete legal issues, presented in actual cases, not abstractions, are requisite." *United Public Workers of America v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (internal quotation marks omitted). To obtain declaratory judgment, then, plaintiffs must show the presence of "a substantial controversy ... of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). "A hypothetical threat is not enough." *United Public Workers,* 330 U.S. at 90, 67 S.Ct. at 564. *See also Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).

The standing requirements for declaratory relief therefore mirror the requirements for injunctive relief. Thus, the absence of a "real and immediate harm" that prevented the Court from granting injunctive relief also prevents the Court from granting declaratory relief. Accordingly, the Court shall grant summary judgment for defendants as to plaintiffs' request for declaratory and injunctive relief against the state defendants.

■ Defendants' assertion that this case is moot requires only a few words. First, the reason for mootness defendants suggest—that Levinson–Roth could not demonstrate that she would again be subject to arrest by the Sheriff's Department—is more properly understood as an argument that plaintiffs lack standing, as the foregoing discussion shows. Second, a case becomes moot only when a court's decision "cannot affect the rights of litigants in the case before them." *Rice,* 404 U.S. at 246, 92 S.Ct. at 404. Here, an action for damages against defendants may remain, and a decision in plaintiffs' favor could indeed "affect the rights of [the] litigants" before the Court. *See Rice, supra* (possible collateral consequences of conviction prevented Court from judging case moot); *cf. Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (prisoner's parole mooted claim against alleged procedural deficiencies in parole consideration). Defendants' mootness argument thus misses the point.

### 3. *Eleventh Amendment Immunity*

■ Although plaintiffs do not contest that the Eleventh Amendment prevents them from holding the State of Maryland liable for damages, the Court must still address whether the Eleventh Amendment similarly precludes liability against Sheriff Kight and Deputy Sheriff Popkin. This question depends upon whether the sheriff and his depu-

ties are state officers; if they are, they may avail themselves of the State of Maryland's sovereign immunity. *See Edelman, supra.* The Court determines the status of Sheriff Kight and Deputy Popkin by referring to Maryland law. *Dotson v. Chester,* 937 F.2d 920, 924–26 (4th Cir.1991).

The Maryland Court of Appeals, the state's highest court, has held that the Sheriff is a state officer. *Rucker v. Harford County,* 316 Md. 275, 558 A.2d 399 (1989). Although the Court of Appeals stated that it lacked the authority to address whether the Sheriff may be a state officer for the purposes of a § 1983 claim, *id.* 558 A.2d at 401–02, federal law refers the question of the proper classification of the Sheriff to state law. *Dotson,* 937 F.2d at 924–26. Accordingly, the Court finds that *Rucker* applies here and holds that Sheriff Kight and Deputy Popkin are state officers for the purposes of § 1983.

The Court shall therefore grant summary judgment for the State of Maryland and for Sheriff Kight and Deputy Popkin in their official capacities. The Court's disposition on this issue makes unnecessary a discussion of whether Sheriff Kight and Deputy Popkin in their official capacities are "persons" within the meaning of § 1983.[4]

### 4. *Supervisory Liability*

■ The amended complaint alleges that Sheriff Kight "is responsible for the actions of his deputies." (Amended Compl. ¶ 38.) From this, it seems that plaintiffs may still seek to hold the State of Maryland and Sheriff Kight responsible for the alleged violations of Levinson–Roth's constitutional rights through the doctrine of supervisory liability. (*See* Pl.Resp. to Def.Mot. for Summary Judgment ¶¶ 23–26.)

The Supreme Court, however, has held that "the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell v. Dept. of Social Services,* 436 U.S. 658, 694 n. 58, 98 S.Ct. 2018, 2037 n. 58, 56 L.Ed.2d 611 (1978) (citing *Rizzo v. Goode,* 423 U.S.

362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976)). Therefore, plaintiffs may impose supervisory liability on Sheriff Kight only if they can show that "supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the injuries they inflict. . . ." *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984), *cert. denied sub nom. Reed v. Slakan,* 470 U.S. 1035, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). To establish such supervisory liability under § 1983, a plaintiff must show

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud,* 13 F.3d 791 (4th Cir.), *cert. denied,* —— U.S. ——–——, 115 S.Ct. 67–68, 130 L.Ed.2d 24 (1994) (internal quotation marks omitted).

■ Further, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* at 799 (quoting *Slakan,* 737 F.2d at 373–74). In other words, plaintiffs must show "continued inaction in the face of documented abuses." *Shaw,* 13 F.3d at 799 (quoting *Slakan,* 737 F.2d at 373). A single incident does not satisfy this element, *Shaw,* 13 F.3d at 799; *Slakan,* 737 F.2d at 372–73, unless the officials responsible for establishing a policy made "a calculated choice to follow the course of action deemed unconstitutional." *Pachaly v. City of Lynchburg,* 897 F.2d 723, 726 (4th Cir.1990).

Plaintiffs have presented no evidence of "deliberate indifference" to continued abuses.

---

4. Defendants would have prevailed on this issue in any event. *Will v. Michigan Dept. of State*

*Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

Plaintiffs have only submitted a copy of the Sheriff's Office's arrest guidelines. The guidelines do not mandate any of the alleged constitutional abuses of which plaintiffs complain, nor do they demonstrate a "deliberate indifference" to the continued violation of constitutional rights necessary for a finding of supervisory liability. Moreover, the single incident which plaintiffs allege does not show the pattern of continued constitutional violations necessary for a finding of supervisory liability under *Shaw* and *Slakan.*

Additionally, the complaint as amended does not allege that Sheriff Kight actually exercised any direction over Deputy Popkin in the arrest of Levinson–Roth, nor does the complaint allege that Sheriff Kight failed to supervise properly Deputy Popkin. The complaint merely alleges that Sheriff Kight "is responsible for the actions of his deputies." (Amended Compl. ¶ 38.) This allegation, by itself, fails to support a charge of supervisory liability. Because the complaint does not state a valid cause of action against Sheriff Kight personally for supervisory liability, and because the Eleventh Amendment prevents Sheriff Kight from being held liable otherwise, the Court shall grant summary judgment in favor of Sheriff Kight in his official and personal capacities.

### 5. *Violation of Constitutional Rights*

#### a. *The False Arrest Claim*

"The first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979) (quoting 42 U.S.C. § 1983); *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1870–71, 104 L.Ed.2d 443 (1989). The state defendants contend that they did not violate Levinson–Roth's constitutional rights by arresting her, nor did the state defendants' conduct subsequent to the arrest violate any constitutional rights.

 As to the arrest itself, the Court agrees with defendants. Generally, § 1983 does not hold liable officers who arrest a person based on a facially valid arrest war-

rant, even if the warrant is actually invalid. *Baker, supra; Mitchell v. Aluisi,* 872 F.2d 577, 579–80 (4th Cir.1989). Similarly, the restraints incident to arrest, such as the being placed in handcuffs, do not give rise to a § 1983 action. *See Baker, supra; Aluisi, supra.*

 To avoid the holding of *Baker* and its progeny, plaintiffs allege that the usual procedure for an arrest warrant differed from the procedure followed in the instant matter. Usually, plaintiffs assert, the complaining party files a show cause order, and the Sheriff serves the alleged offending party with the order instead of attaching the person as the deputies did here. From this, plaintiffs argue that the procedure the deputies employed in this case should have alerted them to the fact that the body attachment was facially invalid.

Two flaws undermine plaintiffs' argument. First, plaintiffs do not present any evidence, nor do they cite any rules of procedure, to support their assertions as to the procedure for enforcing a contempt order. Their bare allegations do not suffice to establish the fact as true. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 3188–89, 111 L.Ed.2d 695 (1990); *Pachaly,* 897 F.2d at 726 ("Mere allegation [is] not enough to defeat [a] well supported motion for summary judgment.")[5] Second, even if the Court accepted plaintiffs' assertions, plaintiffs have not shown, nor can the Court perceive, how the violations of those guidelines would violate Levinson–Roth's constitutional rights.

#### b. *The Alleged Pat–Downs*

The six pat-downs stand on different ground. Plaintiffs allege that the deputies patted Levinson–Roth down six times. The deputies state that they only patted her down once or twice. Whether the pat-downs occurred therefore constitutes a material, disputed fact, which the Court may not resolve on summary judgment. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Instead, the Court shall assume *arguendo* the truth of plaintiff's

---

5. Defendants' summary judgment motion challenges the assertion that the state court was

required to issue a show cause order rather than a body attachment. (Def. Reply to Pl.Opp. at 3.)

version of the facts. *Overstreet*, 950 F.2d at 737.

■ Pat-downs constitute searches within the meaning of the Fourth Amendment. *E.g., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because they fall within the scope of the Fourth Amendment, they attract Fourth Amendment scrutiny. *See Albright v. Oliver*, —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion) (false arrest claim under § 1983 requires Fourth Amendment "seizure" analysis). Accordingly, the Court now addresses whether the alleged pat-downs violated Levinson–Roth's Fourth Amendment rights.

■ The Fourth Amendment permits an officer to search a person placed under arrest as an incident to the arrest itself. *E.g., United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). The police officer's right to search does not depend on any subjective fear on the part of the officer. Rather, the right derives from the arrest itself. *Id.*

That police officers may search a person incident to an arrest, however, does not suggest that there exist no limits on the extent of those searches. For example, in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court considered the propriety of strip searching pretrial detainees. There, the Court considered a rule requiring all inmates to submit to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution. In considering whether the practice violated the prisoner's Fourth Amendment rights, the Court acknowledged that even "convicted prisoners," which Levinson–Roth was not, "do not forfeit all constitutional protections by reason of their ... confinement in prison." *Id.* at 545, 99 S.Ct. at 1877. Rather, the Court stated, searches "must be conducted in a reasonable manner." *Id.* at 560, 99 S.Ct. at 1885. After describing the Fourth Amendment limits on strip searches, the Court found that the threat that the prisoners may attempt to smuggle weapons into the facility justified the searches. *Id.* at 559–60, 99 S.Ct. at 1884–85.

The Fourth Circuit has also held that the Fourth Amendment sets limits on searches of arrested persons. *Logan v. Shealy*, 660 F.2d 1007 (4th Cir.1981), *cert. denied sub nom. Clements v. Logan*, 455 U.S. 942, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982). In *Logan*, police conducted a non-contact visual strip search of a woman who had been arrested for driving while intoxicated. To support its holding that the strip search violated the woman's Fourth Amendment rights, the Fourth Circuit noted that the police had not arrested the plaintiff for an offense "commonly associated by its very nature with the possession of weapons or contraband." *Logan*, 660 F.2d at 1013. Therefore, the court found that "there was no cause in her specific case to believe that she might possess either." *Id.* at 1013. The court held that the absence of any indicia that the plaintiff may have been carrying weapons or contraband deprived the search of the "discernible relationship to security needs" necessary to overcome the "ultimate invasion of personal rights involved...." *Logan*, 660 F.2d at 1013.

The Seventh Circuit cited *Logan* approvingly in *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983). There, police had conducted non-contact visual strip searches of women who were arrested for various misdemeanor offenses and traffic violations. In reviewing the case, the court first noted that, like Logan, the plaintiffs "were not inherently dangerous and ... were being detained only briefly while awaiting bond." *Mary Beth G.*, 723 F.2d at 1272. The court concluded that the government's security interests did not meet the Fourth Amendment "objective reasonableness" test, because arrests for minor offenses or traffic violations failed to "give rise to a reasonable belief" that the women would possess any prohibited materials. *Id.* at 1273. Thus, the strip searches "bore an insubstantial relationship to security needs so that, when balanced against the plaintiff-appellee's privacy interests, the searches cannot be considered 'reasonable.'" *Id.* at 1273 (citing *Logan, supra* ).

■ *Logan* and *Mary Beth G.* involved strip searches of women detained for minor

violations. In both cases, the courts allowed a custodial pat-down, but disallowed the strip search. In *Wolfish,* the Supreme Court stated that the Fourth Amendment imposed limits on strip searches of pretrial detainees. All three cases teach that a police officer's right to search an individual has limits and that the type of search conducted must depend on certain circumstances. The most important circumstances include the nature of the offense and the likelihood that the detained individual is carrying weapons or contraband. What distinguishes *Wolfish* from *Logan* and *Mary Beth G.* is the greater possibility in *Wolfish* that the individual being searched may have possessed weapons or contraband. *Cf. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884–85; *Mary Beth G.,* 723 F.2d at 1271–72; *Logan,* 660 F.2d at 1013.

Here, the Court notes that, as in *Logan* and *Mary Beth G.,* Levinson–Roth was arrested not for a crime (which would imply the presence of weapons or contraband) but for a civil offense (which does not). The Court also notes that no one has suggested a legitimate reason for the five subsequent pat-downs. Given these facts, a reasonable jury could find that the nature of the offense for which Levinson–Roth was arrested should have sufficiently quelled Deputy Popkin's reasonable fears of finding impermissible items and thus rendered the five subsequent pat-downs unnecessary. A reasonable jury might also conclude that the pat-downs, if they occurred, were unreasonable and undertaken for improper motives. The Court therefore finds that the alleged pat-downs, if they occurred, violated Levinson–Roth's Fourth Amendment right to be free from unreasonable searches.

### 6. *Qualified Immunity*

Despite the alleged Fourth Amendment violation, the question remains whether Deputy Popkin enjoys a qualified immunity. The doctrine of qualified immunity arises from a balance the law strikes between competing societal interests. On one side of the balance, society has an interest in having an "avenue for [the] vindication of constitutional guarantees." *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982). On the other hand, providing such an avenue entails costs to society, such as "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from the acceptance of public office." *Id.* at 814, 102 S.Ct. at 2736.

The law balances these competing interests through the doctrine of qualified immunity. Qualified immunity prevents suits against public officials such as Deputy Popkin if the right allegedly violated was not clearly established *or* if a reasonable officer in the official's position could have failed to appreciate that his conduct would violate a clearly established constitutional right. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039–40, 97 L.Ed.2d 523 (1987); *Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant legal [right] is to be identified." *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39. That is, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039; *Gooden v. Howard County,* 954 F.2d 960, 968 (4th Cir.1992) (en banc). A public official, however, "should not automatically receive qualified immunity simply because there is not a strict factual nexus between their actions and the precedent establishing the right allegedly violated." *McConnell v. Adams,* 829 F.2d 1319, 1325 (4th Cir.1987), *cert. denied sub nom. Virginia ex rel State Board of Elections v. Kilgore,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). Rather, "[p]ublic officials must consider the possible relevance of legal principles established in analogous factual contexts." *Id.* at 1325. Only where there exists "a legitimate question whether [the applicable legal] principles extend to the particular case before the court" may the Court sustain a qualified immunity defense. *Id.* at 1325.

The Court concludes that the law drew a sufficiently bright line to alert Deputy Popkin that he was violating Levinson–Roth's right to be free from unreasonable searches,

if the searches did in fact occur. Therefore, the Court denies Deputy Popkin's claim of qualified immunity.

In summary, although Deputy Popkin does not face liability for the false arrest claim, he remains potentially liable for the alleged pat-downs of Levinson–Roth after the first pat-down. The Court shall therefore deny summary judgment for Deputy Popkin in his personal capacity.

### B. The County Defendants' Motion for Summary Judgment

#### 1. County Defendants' Arguments

The county defendants have also filed a summary judgment motion. In it, defendants argue that plaintiffs have failed to state a cause of action under 42 U.S.C. § 1983 and that the county defendants enjoy qualified immunity from liability under 42 U.S.C. § 1983. In a footnote, the county defendants also claim that the case is moot.

#### 2. Standing

The Article III principles that prevented the Court from ruling upon plaintiffs' prayer for declaratory and injunctive relief against the state defendants also apply to the county defendants.[6] See Part I(B), supra. Therefore, the Court shall grant summary judgment in favor of the county on the issues of declaratory and injunctive relief.

#### 3. Alleged Constitutional Violations

##### a. The Removal of the Wig

As stated above, "[t]he first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" Baker, 443 U.S. at 140, 99 S.Ct. at 2692 (1979) (quoting 42 U.S.C. § 1983); Graham, 490 U.S. 386 at 394, 109 S.Ct. at 1870–71. With an eye to this inquiry, the Court examines the conduct plaintiff alleges occurred at Seven Locks.

---

6. Similarly, the Court rejects the county defendants' contention that this case is moot. See Part I(B), supra.

7. Because neither party cited the Religious Freedom Restoration Act, it is not necessary for the Court to discuss RFRA here. First Assembly of God of Naples, Florida v. Collier County, 27 F.3d

Plaintiffs argue that removing Levinson–Roth's wig violated her religious beliefs and thereby contravened her First Amendment right of freedom of religion. Defendants counter that the security interests necessitated their actions.

Before November 16, 1993, a prison regulation did not violate the First Amendment if it was "reasonably related to legitimate penological interests." Turner v. Safely, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). Obtaining a picture of inmates undistorted by a wig reasonably relates to the legitimate security interest of facilitating inmate identification. Thus, the removal of the wig would satisfy this standard. E.g., Powell v. Estelle, 959 F.2d 22, 24 (5th Cir.), cert. denied sub nom. Harrison v. McKaskle, —— U.S. ——, 113 S.Ct. 668, 121 L.Ed.2d 592 (1992).

The recently enacted Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4 (1993) ("RFRA"), however, abolishes the Turner standard. Under the new RFRA standard, if the government "substantially burden[s] a person's exercise of religion," it must demonstrate that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1.

RFRA may apply to this case. By its terms, RFRA applies retroactively, 42 U.S.C. § 2000bb–3(a), and it applies to the First Amendment rights of prison detainees. Campos v. Coughlin, 854 F.Supp. 194, 206 (S.D.N.Y.1994) (citing S.Rep. No. 103–111, 103rd Cong., 1st Sess. 11 (1993)); Allah v. Menei, 844 F.Supp. 1056, 1062 nn. 18–19 (E.D.Pa.1994). Neither party, however, brought this Act to the Court's attention.[7]

Assuming RFRA applies, plaintiffs' claim would nonetheless fail because they have not made the required threshold showing that the government "substantially burden[ed]"

---

526 (11th Cir.1994) (per curiam), petition for cert. filed, 63 U.S.L.W. 3388 (U.S. November 1, 1994) (No. 94–791); Brown–El v. Harris, 26 F.3d 68, 69 (8th Cir.1994). In the interests of completeness, the Court shall address the applicability of the Act nonetheless.

the exercise of Levinson–Roth's religion. 42 U.S.C. § 2000bb–1(a); *Boone v. Comm'r of Prisons,* No. CIV. A. 93–5074, 1994 WL 383590 at * 7 (E.D.Pa. July 21, 1994) (citing *Graham v. Comm'r,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom. Hernandez v. Comm'r,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). Plaintiffs have shown an interference with Levinson–Roth's religious beliefs, but they have not attempted to demonstrate that the interference was substantial, as RFRA requires. Given that the officers provided Levinson–Roth a towel with which to cover her head and that her head was only momentarily exposed, making such a demonstration would present remarkable, if not insuperable difficulties. Accordingly, because the MCDC's actions satisfy the *Turner* standard, and because plaintiffs' have not sufficiently pleaded a RFRA violation, the Court shall grant summary judgment for the county defendants on this issue.

### b. The Wearing of the Pants

▮▮▮ The First Amendment issues surrounding defendants' forcing Levinson–Roth to wear pants would appear to precipitate the same analysis as the removal of her wig, with similar results. Defendants, however, ignored this claim in their briefs. In a summary judgment context, defendants bear the responsibility of articulating those interests to the Court. *Ali v. Dixon,* 912 F.2d 86, 90 (4th Cir.1990). In the absence of such an articulation, the Court cannot grant summary judgment for defendants on the issue of whether forcing Levinson–Roth to wear pants violated her constitutional rights. *E.g., Ali,* 912 F.2d at 90 (reversing grant of summary judgment where prison failed to advance any justification for practice); *Caldwell v. Miller,* 790 F.2d 589, 597–99 (7th Cir.1986) (same).

### c. The Strip Search

▮▮▮ *Logan,* discussed above, sets out the standards by which the Court judges the strip search at issue here. There, the Fourth Circuit listed the factors central to its decision that the strip search at the detention center violated the plaintiff's constitutional rights. First, the detention center in *Logan* never "intermingled [the plaintiff] with the general jail population." *Logan,* 660 F.2d at 1013. Second, the plaintiff's offense was "one not commonly associated by its very nature with the possession of weapons or contraband." *Id.* at 1013. Third, "there was no cause in [the plaintiff's] specific case to believe that she might possess" weapons or contraband. *Id.* at 1013.[8] In conclusion, the court found, "[a]n indiscriminate strip-search policy routinely applied to all detainees … cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations." *Id.* at 1013.[9]

The factors that concerned the *Logan* court occur in this case. Here, as in *Logan,* the police did not intermingle Levinson–Roth with the general jail population. Also, as defendants knew, Levinson–Roth was incarcerated not for an offense associated with the possession of weapons or contraband, but for the civil offense of failure to pay child support. (Ward Depo. at 9–10.) Third, the officers did not suspect that she possessed contraband. (Ward Depo. at 31.)

The prison has advanced no justification for the strip search other than the detention center policy itself. (*See* Ward Depo. at 38.) Even if the policy could justify itself, *Logan* makes clear that detention center officials may not conduct indiscriminately applied strip searches on the basis of "administrative ease," *Logan,* 660 F.2d at 1013. The strip search therefore violated Levinson–Roth's

---

**8.** The *Logan* court also noted that the plaintiff had spent one and one-half hours in the detention center without being patted down. *Logan,* 660 F.2d at 1013. That is not an issue here.

**9.** Several Courts of Appeals have considered cases in which police strip searched a person arrested for a non-criminal or minor offense. In every case, the courts have held that the strip search violates the person's constitutional rights. *E.g., Masters v. Crouch,* 872 F.2d 1248 (6th Cir.), *cert. denied sub nom. Frey v. Masters,* 493 U.S.

977, 110 S.Ct. 503, 107 L.Ed.2d 506 (1989); *Watt v. City of Richardson Police Dept.,* 849 F.2d 195 (5th Cir.1988); *Weber v. Dell,* 804 F.2d 796 (2d Cir.1986), *cert. denied sub nom. County of Monroe v. Weber,* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987); *Jones v. Edwards,* 770 F.2d 739 (8th Cir.1985); *Giles v. Ackerman,* 746 F.2d 614 (9th Cir.1984), *cert. denied* 471 U.S. 1053, 105 S.Ct. 2114, 85 L.Ed.2d 479 (1985); *Hill v. Bogans,* 735 F.2d 391 (10th Cir.1984).

Fourth Amendment right to be free from unreasonable searches.

### 4. *Defendants' Participation in Alleged Violation*

The second inquiry in a § 1983 case is whether the persons mentioned in the suit "caused [plaintiff] to be subjected" to the deprivation of plaintiff's constitutional rights. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 817, 105 S.Ct. 2427, 2432–33, 85 L.Ed.2d 791 (1985) (quoting 42 U.S.C. § 1983). The record links Captain Ward to the alleged conduct sufficiently to defeat a summary judgment motion.

■ The record does not suggest, however, that Corporal Watts participated in any constitutionally proscribed activity. By all accounts, he merely processed Levinson–Roth into the facility in accordance with his duties. The Court shall therefore grant summary judgment in favor of Corporal Watts by separate Order.

### 5. *Qualified Immunity*

■ Qualified immunity, discussed above, will protect the county defendants from liability in their personal capacity if the right allegedly violated was not clearly established or if a reasonable officer in the official's position could have failed to appreciate that his conduct would violate a clearly established constitutional right. *Anderson,* 483 U.S. at 641; *Pritchett,* 973 F.2d at 312. As detention center officials, Brown, Captain Ward and Corporal Johnson may enjoy qualified immunity if they satisfy these criteria. *Procunier v. Navarette,* 434 U.S. 555, 561–62, 98 S.Ct. 855, 859–60, 55 L.Ed.2d 24 (1978).

In 1981, *Logan, supra,* held that strip searching an arrestee without a reasonable suspicion that the arrestee possesses weapons or contraband violates the Fourth Amendment. Its progeny, which have repeatedly reaffirmed this holding,[10] include a successful suit against Montgomery County and the Montgomery County Detention Cen-

ter, two of the defendants in this case. *Smith v. Montgomery County,* 643 F.Supp. 435 (D.Md.1986).[11]

As stated above, the officers knew that Levinson–Roth was a civil detainee and did not suspect that Levinson–Roth carried weapons or contraband. In spite of this knowledge, they subjected her to a strip search. The Court finds that the law at the time of the incident in question clearly established Levinson–Roth's right not to be subjected to a strip search. The Court also finds that a reasonable person in defendants' position would have known that their actions violated that right. Accordingly, the Court shall deny the county defendants' claim of qualified immunity.

### 6. *Supervisory Liability*

■ As discussed above, plaintiff may impose supervisory liability upon Brown only if the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38. With its summary judgment motion, the county defendants submitted the MCDC policy mandating the strip search of all incoming inmates. Policy at 7. In doing so, they have conceded that the officers conducted the strip search pursuant to official policy and have allowed the imposition of supervisory liability upon Brown and Lightfoot.

## III. *CONCLUSION*

Various legal doctrines prevent plaintiffs from asserting their claims against most of the state defendants in federal court. Plaintiffs' lack of standing prevents them from obtaining declaratory or injunctive relief against the state. The Eleventh Amendment precludes plaintiffs from obtaining money damages from the State of Maryland or from the sheriff or his deputies in their official capacities. Also, Sheriff Kight did not participate in the alleged acts sufficiently to

---

**10.** See cases cited in footnote 8, *supra.*

**11.** *Smith,* decided in 1982, concerned a woman who was arrested in connection with a child support action and strip searched in the Montgomery County Detention Center. The court

held the strip search unconstitutional. *Smith v. Montgomery County,* 547 F.Supp. 592 (D.Md. 1982), *appeal dismissed,* 740 F.2d 963 (4th Cir. 1984) (granting plaintiff's preliminary injunction motion).

subject himself to supervisory liability. Accordingly, the Court shall, by separate Order, grant summary judgment for the State of Maryland, Sheriff Kight in his official and personal capacity and Deputy Popkin in his official capacity.

Consequently, of the state defendants, only Deputy Popkin remains liable in his personal capacity for the alleged violation of Levinson–Roth's constitutional rights. The Court finds that the complaint alleges facts which, if proven, would constitute a violation of Levinson–Roth's Fourth Amendment right to be free from unreasonable searches. The Court holds that the law "clearly established" this right in the factual context in which Deputy Popkin allegedly acted, thus depriving Deputy Popkin of the protection of qualified immunity. Plaintiffs may therefore proceed against Deputy Popkin personally for the alleged six pat-downs, but may not proceed against him on their false arrest theory, as it does not find support in the law. Accordingly, the Court shall deny summary judgment as to Deputy Popkin in his personal capacity by separate Order.

The county defendants remain partially liable on plaintiffs' First Amendment claims. Although the removal of Levinson–Roth's wig did not violate her constitutional rights, the county defendants' failure to present any evidence to justify requiring her to wear pants precludes summary judgment on this issue.

As to plaintiffs' Fourth Amendment claim, the strip search to which the county defendants subjected Levinson–Roth violated her Fourth Amendment right to be free from unreasonable searches. Moreover, the law clearly established Levinson–Roth's right to be free from strip searches absent any indication that she possessed weapons or contraband, thus depriving the county defendants of a qualified immunity defense. Thus, of the county defendants, only Corporal Watts avoids liability on the ground that he did not participate in the search.

The Court shall issue an appropriate Order.